# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-18-00779-CR

---

**Christopher Edward Noland, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 340TH DISTRICT COURT OF TOM GREEN COUNTY**
**NO. C-16-0997-SA, THE HONORABLE JAY K. WEATHERBY, JUDGE PRESIDING**

---

### M E M O R A N D U M   O P I N I O N

A jury convicted Christopher Edward Noland of the second-degree felony offense of burglary of a habitation; found that he used or exhibited a deadly weapon during the commission of the offense; and assessed his punishment, enhanced by two prior final felony convictions, at twenty-five years' imprisonment. *See* Tex. Penal Code §§ 1.07(a)(17) (defining "deadly weapon"), 12.42(d) (providing habitual-offender punishment range of twenty-five to ninety-nine years or life), 30.02(a), (c)(2) (defining offense of burglary of habitation). The district court rendered judgment accordingly. On appeal, Noland contends that his counsel was ineffective during the guilt-innocence phase because he did not "fully" investigate the facts and circumstances of the case, seek out and interview potential witnesses and seek out and produce evidence for trial. Noland also contends that because his counsel was ineffective, the district

court erred by denying Noland's motion for new trial raising that complaint. We will affirm the district court's judgment of conviction.

## BACKGROUND

Noland was indicted for burglary of a habitation committed on or about September 5, 2016, and it was alleged that he used or exhibited a deadly weapon during the commission of the offense. A disputed issue at trial was whether Noland had authority or consent to enter the house at 1139 East 24½ Street in San Angelo, Texas. Witnesses at trial included Michelle Balonis; her daughter, Logan Hoy; Noland; Noland's mother, Carla Cole; and Noland's acquaintance, Brenton "Jack" Collier.

**Testimony about ownership of house and living arrangements**

Balonis testified that she acquired ownership of the house in 1997 by inheritance from her mother. A certified copy of Balonis's mother's will and the order admitting it to probate were admitted into evidence. Balonis stated that she and Noland were in a dating relationship from December 2015 until about a month before the offense. Noland lived in her house during the first two months of their relationship. Balonis stated that Noland wanted cable at the house and that the bill was in his name but never paid, and it was eventually cut off. Balonis also stated that electricity to the house was cut off when she had financial difficulties, and the bill was put in Noland's name to have it restored although she continued paying it.

Balonis testified that after February 2016, Noland did not live at her house, but would stay there "[a] couple of days and then he'd leave" to stay at an apartment with Cole. Cole testified that on the date of the offense, September 5, 2016, Noland lived at 1139 East 24½ Street. However, Cole also testified that Noland did not stay at Balonis's house when Balonis's

2

daughter Hoy was there. Similarly, Balonis, and Noland also testified that Noland did not stay at Balonis's house after her daughter moved back in, which Balonis said was "right before school in August" 2016. Noland listed 1139 East 24½ Street as his address in documents provided to his bail-bond provider in July of 2016 and in documents provided to his employer, where he worked from June 4 until July 29, 2016. Balonis testified that she did not know where Noland told these other people that he was living.

**Events on evening before and morning of offense**

On September 4, 2016, the evening before the offense, Noland called and texted Balonis after work, asking her to pick him up from a location on 23rd Street in San Angelo. Balonis drove her truck to pick up Noland that evening and take him to his mother's apartment. On the way there, Noland "started becoming irate." Balonis stopped the truck and pulled the keys from the ignition, and Noland "forcibly ripped" the keys from her hands. Noland then started driving Balonis around town in her truck while arguing about her seeing other people. Balonis testified that she stayed in the truck because she did not want Noland to take it from her.

Balonis said that Noland drove to a location on Bailey Street where he picked up Collier, a man that she did not know. Noland resumed his "screaming and yelling" and "erratic driving." He told Balonis to roll a tobacco cigarette for him. Balonis turned on the truck's interior dome light after they drove past two police officers. Noland then punched Balonis in the face. Balonis tried to jump from the truck, but Noland grabbed her by her hair and shirt. From the backseat of the truck, Collier grabbed Noland, who stopped the truck in a residential area.

Balonis jumped from the truck, ran to a house, and banged on the door, but she did not hear any response. She hid outside the house and listened as Noland circled the block

3

multiple times in her truck. Collier, who had also fled from the truck, found Balonis. She asked him not to take her back to Noland, and Collier said he would not. Balonis used Collier's phone to call the police and notify them that Noland had her truck. Balonis and Collier had walked a short distance when police called about finding the truck, and they took Balonis to retrieve it. Collier "started walking down the road" because Balonis did not want Noland seeing her with him.

After retrieving her truck, Balonis drove to find Collier. He went home with her for protection because she was fearful that Noland would go to her house that night, and she thought she "had a better chance with [Collier] being there" than she and Hoy would have on their own. Balonis placed a two-by-four board against the front door to secure it because the door frame was "busted" and there was nothing holding the bolt inside the wood, which allowed the door to be pushed open even when locked. Balonis testified that while she and Collier were sitting in the kitchen, she heard her front door being kicked open, something Noland had done at other times when he was angry. Noland entered the kitchen, picked up a bat that was there, began screaming, and swung the bat with enough force to break the kitchen table. Balonis ran to Hoy's room telling her to call the police.

Hoy had a two-by-four board in her room. She took it to the kitchen where she saw Noland swinging a bat in the air and accusing Collier of "messing with his old lady" in "more vulgar terms." Balonis testified that she saw Noland with the bat over his head and "going at me and my daughter." Balonis and Hoy "rushed" toward Noland in a "ducking motion," pushing the two-by-four board at him, colliding with him, and causing him to bend forward from the waist.

4

While Noland was bent over, Collier approached from the front with a kitchen knife and stabbed the back side of Noland's left shoulder. Collier testified that he did so because he thought Noland was going to hurt Balonis and Hoy with the baseball bat. Balonis saw Noland stumble into her room, but she did not see Collier stab him, and she did not know where Noland's wound was located. Hoy ran outside to call police and waited there until they arrived.

Balonis denied that Noland had her consent to be in her house that night. She testified that the last time Noland had consent to be in her house was around the time that she talked to Hoy about moving back home. She further testified that although Noland's mother's dog was in her backyard, none of Noland's belongings were in her house. The last time Noland could have thought that the two of them "were together" would have been two weeks before Hoy moved in, which was the "first of August."

**Noland's testimony about events**

Noland testified about his recollection of the events. He stated that he got high on methamphetamine at 2:00 p.m. on September 4, 2016. Balonis picked him up later that afternoon, and they got into an argument. Noland stated that they subsequently drove to the "EQ"—an equalization channel at a reservoir in San Angelo—where they had sex. Around midnight, they went to his mother's apartment and then went out to eat. Noland testified that he had some drugs with him and that Balonis did not want them in her truck or "in the home." Noland tried to "get rid of" the drugs by selling them at a game room and then at a house where Collier was, but "[n]obody had any money there." Noland asked Collier to help him to "get rid of it" at another game room that Noland could not enter after being "kicked out." Collier agreed and got into the truck with Collier and Balonis.

5

Noland testified that he had drugs on him at the time, he was high, and Balonis was drinking beer. He recalled driving to the game room at 2:00 a.m. when Balonis turned on the dome light, which Noland said was "not the brightest thing to do because of law enforcement," and it increased their likelihood of being "pulled over." Noland got into an argument with Balonis, who tried to jump from the moving truck. Noland denied that he hit or punched Balonis, and he said he did not "have a clue" why she wanted to jump out of the truck. Noland grabbed hold of Balonis, and Collier reached from the backseat and grabbed Noland. Noland "locked up the brakes," Balonis jumped out of the truck, and Collier followed.

While Noland drove around looking for them, the police pulled him over in the truck. They told Noland about Balonis's call and asked him for the keys because the truck was in her name. Noland testified that he wanted to go home, and that he asked the police to ask Balonis for a ride to his mother's, or he would "walk to the house." Balonis declined, and Noland decided to walk to 1139 East 24 ½ Street "because [he] was on that side of town" and "[t]hat's my home."

Noland testified that when he arrived at the house, he wanted to sleep and was upset about the walking but not "angry at any person in general." He denied kicking in the door to the house when he arrived, although he admitted that he had done so once or twice before. Noland denied breaking into the residence at 1139 East 24½ Street asking, "How do you break into your own house?" Noland stated that he entered the house by "push[ing] through" the door. He saw Collier without a shirt in the kitchen and asked him, "Are you f—g my old lady?" Noland next saw Hoy and Balonis running at him with a "two by four." He was hit and tried to push them back. Right after he was hit with the board, Noland thought Collier punched him. He did not know that he had been stabbed. He knocked Collier down, grabbed a bat that was in the

6

kitchen, and hit the table. Noland testified that he did not realize he had been stabbed until "air and blood started shooting out of" him, and he "folded over." After the police arrived, he was transported to the hospital and later arrested.

After trial, the jury found Noland guilty as charged and assessed his punishment, and the district court rendered judgment accordingly. Noland filed a motion for new trial contending that defense counsel was ineffective because he did not investigate information in affidavits from Ryan Dalton and Maria Van Gundy—who averred that the residence at 1139 East 24½ Street in San Angelo, Texas, was Noland's residence on or about September 4, 2016—and because neither one was subpoenaed to testify at trial. After an evidentiary hearing, the district court denied the motion for new trial. This appeal followed.

## DISCUSSION

**Denial of Noland's motion for new trial raising ineffective-assistance-of-counsel claim[1]**

The ineffective-assistance claim in Noland's motion for new trial was limited to information not pursued from Dalton and Van Gundy as to Noland's "right to be present in the residence." At the hearing on the motion, he presented evidence also faulting his trial counsel for not pursuing or presenting evidence from Noland's former employer and co-worker, Noland's bail-bond provider, Noland's prior interactions with police, Noland's brother, Noland's mail, and Noland's recorded jailhouse phone calls. On appeal, Noland bases his ineffective-assistance claim on all of these alleged failures.

When a defendant raises an ineffective-assistance-of-counsel claim in a motion for new trial, we review the trial court's denial of that motion under an abuse of discretion

---

[1] Noland briefed his two issues, ineffective assistance of counsel and denial of his motion for new trial, together in his brief. We will also address them together.

7

standard. *Burch v. State*, 541 S.W.3d 816, 820 (Tex. Crim. App. 2017); *Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004). This deferential standard requires us to view the evidence in the light most favorable to the trial court's ruling. *Burch*, 541 S.W.3d at 820. We must uphold the trial court's ruling if it is within the zone of reasonable disagreement, and reverse that ruling only if no reasonable view of the record could support it. *Id.*

An ineffective-assistance-of-counsel claim requires the defendant to prove (1) counsel's deficient performance and (2) prejudice to the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Perez v. State*, 310 S.W.3d 890, 892-93 (Tex. Crim. App. 2010). The deficient-performance component requires the defendant to prove by a preponderance of the evidence that his counsel's performance fell below the standard of prevailing professional norms. *Strickland*, 466 U.S. at 688; *Perez*, 310 S.W.3d at 893. Our review of defense counsel's performance is "highly deferential," and counsel is afforded a "strong presumption" that his conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Perez*, 310 S.W.3d at 893. To rebut that presumption, a defendant's ineffective-assistance claim must be "firmly founded in the record," and the record "must affirmatively demonstrate" the meritorious nature of the claim. *Menefield v. State*, 363 S.W.3d 591, 592 (Tex. Crim. App. 2012) (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)).

The prejudice component requires proof by a preponderance of evidence that, but for counsel's deficiency, there is a reasonable probability—sufficient to undermine confidence in the outcome—that the result of the trial would have been different. *Strickland*, 466 U.S. at 694; *Perez*, 310 S.W.3d at 893. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 694; *Perez*, 310 S.W.3d at 894. "Failure to make the required showing of either deficient performance or

8

sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700; *see Perez*, 310 S.W.3d at 893.

Noland points out that counsel may be found ineffective if his failure to investigate by seeking out and interviewing potential witnesses "precludes a defendant from advancing a viable defense." *See State v. Thomas*, 768 S.W.2d 335, 336-37 (Tex. App.—Houston [14th Dist.] 1989, no pet.) (holding that defendant accused of sexual assault, who testified that complainant offered him sex for cocaine, was prejudiced by his counsel's failure to call witnesses who would have testified that defendant and complainant had ongoing sexual relationship and that complainant had previously traded sex for drugs). However, counsel's decision about the necessary amount of investigation is afforded a "heavy measure of deference" and assessed in light of all the circumstances to determine whether reasonable professional judgment would support the decision. *See Strickland*, 466 U.S. at 691 ("In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."). Here, Noland contends that "[c]onsent was [his] most viable defense."

1. **No evidence at trial that Noland had authority or consent to enter at time of offense**

The offense of burglary of a habitation, as applicable here, can be proved if a person "without the effective consent of the owner . . . (1) enters a habitation . . . with intent to commit . . . an assault." Tex. Penal Code § 30.02(a)(1). A necessary element of that offense would be negated if Noland either: (1) owned the house located at 1139 East 24½ Street, or (2) had Balonis's effective consent, as the owner, to enter the house at the time of the offense. Thus, a central dispute during trial was whether Noland—at the time of the offense in the early-

morning hours of September 5, 2016—had authority as an owner or consent of an owner to enter the house. Noland expressly questioned how one could burglarize his "own house." But he was not the owner.

"The Penal Code imparts a specialized and technical meaning to the word 'owner,' defining it as a person who (1) has title to the property, (2) possession of the property, or (3) a greater right to possession of the property than the actor [the defendant]." *Morgan v. State*, 501 S.W.3d 84, 91 (Tex. Crim. App. 2016) (quoting Tex. Penal Code § 1.07(a)(35)(A)). "The 'greater right of possession' doctrine applies to any prosecution for burglary." *Id.*; *Alexander v. State*, 753 S.W.2d 390, 392 (Tex. Crim. App. 1988) ("Ownership of the burglarized premises may be proven in one of three ways: (1) title, (2) possession, or (3) a greater right to possession than the defendant."). As the Court of Criminal Appeals has noted, the definition of "owner" set forth in the Penal Code "clearly indicates that a defendant who has some, but less, right to control a habitation than the alleged owner may be prosecuted for burglary." *Id.* (citing *Compton v. State*, 607 S.W.2d 246, 250-51 (Tex. Crim App. 1980) (op. on reh'g) ("By adding the third theory of ownership to the penal code, i.e., greater right to possession, it is clear that the Legislature intended to expand the class of individuals to be protected from theft.").

Accordingly, a significant inquiry here was whether Balonis's right to possess the property at the time of the offense was *greater* than Noland's. *See id.* at 91-92 ("'[O]wner' is who, *at the time of the commission of the offense*, had the greater right to possession of the property." (quoting *Freeman v. State*, 707 S.W.2d 597, 603 (Tex. Crim. App. 1986) (emphasis in original)). It was undisputed at trial that Balonis inherited the house at 1139 East 24½ Street from her mother. Noland's status as her intermittent guest did not give him equal "ownership" rights to the house. *See id.* at 91. While the residence was, for a period of time before the early-

10

morning burglary, Noland's "own house" in terms of where he sometimes "stayed," Balonis—not Noland—was the "owner." *See* Tex. Penal Code § 1.07(a)(35)(A).

Further, as to the issue of consent—which Noland claims was his "most viable defense"—the Court of Criminal Appeals has stated that "the testimony of an owner that she did not give permission to enter the habitation is 'sufficient to establish the absence of effective consent.'" *Morgan*, 501 S.W.3d at 91 (quoting *Ellett v. State*, 607 S.W.2d 545, 550 (Tex. Crim. App. 1980) (noting that even if door was open when defendant entered, that circumstance did not establish that defendant had owner's effective consent to enter)). Balonis testified that Noland had argued with her and punched her in the face; that she fled from him and hid; that she feared him going to her house; that she placed a board to secure the front door against entry; that Noland kicked the door in (as he had done at other times); and specifically, that he did not have her consent that night to be in her house. This was evidence that Noland entered the house without Balonis's effective consent as the owner. *See id.*

### 2. No evidence at new-trial hearing that Noland had authority or consent to enter at time of offense

As the State correctly notes, evidence at the new-trial hearing only confirmed what the jury heard during trial—that Noland lived in Balonis's house for a period of time before the early-morning burglary. No evidence, aside from Noland's self-serving testimony, showed that he had Balonis's effective consent, as the owner, to enter the house at the time of the offense. *See id.* at 92 (concluding that owner's giving or removing of effective consent to enter is measured at time of criminal act). Evidence at the new-trial hearing about living at Balonis's house included:

11

1. Business records that Noland completed during his 55-day employment at Mitchell Toyota, listing 1139 East 24½ Street as his address in June 2016;

2. Testimony from a co-worker at Mitchell Toyota that Noland referred to 1139 East 24½ Street as "our house" in July 2016;

3. Testimony from an office manager of a bail-bonds company that their records showed Noland's address as 1139 East 24½ Street in July 2016;

4. Testimony from police officers who responded to domestic-disturbance calls at 1139 East 24½ Street and listed that address as Noland's in August 2016;

5. Testimony from Noland's jailed brother that he stayed one night with Noland, did meth with him, and saw Noland's belongings at a house on 24½ Street "about a week" before Noland was stabbed;

6. Various documents mailed to Noland at 1139 East 24½ Street intermittently between January and August 2016, and electricity bills for September and October 2016;

7. Affidavits from Ryan Dalton, Cole's boyfriend, dated July 31, 2018, and from Maria Van Gundy, a family friend, dated August 1, 2018 stating that Noland's residence was 1139 East 24½ Street on or about September 4, 2016; and

8. Recordings of the September 29, 2016 jailhouse calls that Noland made to Balonis, in which she stated that he "came home and . . . grabbed a bat" and that she knew he was "coming back."

The first six categories of evidence reference time frames before the September 5, 2016 offense. Thus, they fail to show that Noland had authority as an owner or Balonis's consent to be at the house at the time of the offense. The two bills mailed in September and October 2016 do not advance Noland's claim of ownership or consent because the uncontroverted evidence at trial was that the account was placed in his name only after the electricity had been shut off, and that Balonis was the only one who paid the electricity bills. Counsel would not have been ineffective for not pursuing or presenting evidence outside the relevant timeframe—i.e., at the time of the criminal act. *See id.*

The seventh category, the affidavits from Dalton and Van Gundy, both state that Noland lived at 1139 East 24½ Street on or about September 4, 2016. However, as discussed above, living at a residence does not establish legal ownership. Moreover, Noland's trial counsel testified at the new-trial hearing that he determined that Dalton and Van Gundy lacked personal knowledge to make that statement in the affidavits. Counsel stated that Cole "kind of just said these two people would pretty much sign. You know, they'd help [Noland] out, kind of, no matter what kind of a thing." Counsel testified, "I did my own investigation, and through that, I determined that they weren't actual witnesses with actual knowledge." *See* Tex. R. Evid. 602 (requiring witness to have "personal knowledge of the matter"). He also looked for other information that might be exculpatory for Noland, reviewed all the discovery, and discussed options with Noland. Counsel concluded that he "explored the case . . . as much as [he] should have." The district court, as the sole judge of the credibility of the witnesses at the new-trial hearing, could have credited counsel's testimony indicating that he had performed an adequate investigation and in his professional judgment, Dalton and Van Gundy would not have been good witnesses due to their lack of personal knowledge. *See Ryder v. State*, 514 S.W.3d 391, 405 (Tex. App.—Amarillo 2017, pet. ref'd) (noting that trial court is trier of fact and sole judge of credibility of witnesses at new-trial hearing); *Melton v. State*, 987 S.W.2d 72, 75 (Tex. App.—Dallas 1998, no pet.) (concluding that trial judge "may properly consider the interest and bias of any witness and is not required to accept as true testimony of the accused or any defense witness" even if uncontradicted). Moreover, because neither Dalton nor Van Gundy was present at the time of the offense, they would not know that Balonis did not consent to Noland entering her house when, as she testified, she reinforced the front door against entry and Noland kicked it in. Thus, testimony from Dalton and Van Gundy would not have benefitted Noland, and counsel

13

would not have been ineffective for not calling them.  *See Ryder*, 514 S.W.3d at 404 (noting that failure to call witness does not constitute ineffective assistance of counsel without showing both that witness was available to testify and that witness's testimony would have benefitted defendant); *Parmer v. State*, 38 S.W.3d 661, 668 (Tex. App.—Austin 2000, pet. ref'd) (same).

As to the eighth and last category of evidence—the recordings of Noland's jailhouse calls to Balonis—Noland's counsel accurately recalled that "they were going back and forth on whether he lived there, and then she . . . made some kind of criminal allegations against him, and I made [Noland] aware of that.  And whenever we talked about it, he decided that we shouldn't enter that into the record."  On the recordings, Noland acknowledges that he began staying at his mother's because Balonis's daughter came home, and that Balonis told him to stay over there.  Balonis stated, "Yes.  My daughter came home and I told you to go to your mother's. . . .  So, yes I kicked your ass out."  Balonis also accused Noland of "break[ing] into my house."

Additionally, although Noland testified at trial that he did not punch Balonis and that he never hit her that night—a potential assault offense independent of the charged burglary—the recordings contain at least ten references to Noland beating or hitting Balonis, and in three of them, Noland apologizes for it:

Noland:  Do you—

Balonis:  —you ended up f—g beating me.

Noland:  I'm sorry.  And I live with it every day.

. . . .

Balonis:  [Y]ou chose to f—g beat me.

Noland:  Uh, uh, I just can't believe I did that.  I'm so sorry.

14

. . . .

Balonis:  But, dude you beat the f—k out [of] me.

Noland:  I'm sorry Micci, and I can never forgive myself.

Noland contended that counsel provided ineffective assistance by failing to investigate the case and present witnesses at trial, specifically pointing to the eight categories of evidence summarized above.  But the proffered evidence failed to show that Noland owned the house or that he had Balonis's consent to enter the house at the time of the offense.  Counsel had concerns about the affidavits and possible testimony from witnesses who wanted to be helpful to Noland but lacked personal knowledge to be good witnesses for him.  *See* Tex. Disciplinary Rules Prof'l Conduct R. 3.03(5), *reprinted in* Tex. Gov't Code, tit. 2, subtit. G, app. A ("A lawyer shall not knowingly: . . . offer or use evidence that the lawyer knows to be false."); *Maddox v. State*, 613 S.W.2d 275, 280 (Tex. Crim. App. 1980) (noting that lawyer has "duty not to knowingly use perjured testimony").  Some of the evidence addressed irrelevant timeframes, and some of it suggested that Noland had been kicked out of Balonis's house when her daughter moved home in August 2016 and that Noland had been staying with his mother since then.  Other evidence included Noland's damaging admissions about his additional criminal conduct of assaulting Balonis.  As counsel testified, "[I]t's a very complicated case on what to introduce and what not to introduce just because you don't want . . . the jury to judge him on certain things that aren't relevant to the case, in my opinion."

After assessing all the circumstances and affording a "heavy measure of deference" to counsel's decision about the necessary amount of investigation, we conclude that reasonable professional judgment would support counsel's decision not to pursue or present the

15

evidence summarized above. *See Strickland*, 466 U.S. at 691. Further, contrary to Noland's contention, counsel's handling of the case did not preclude Noland from advancing a viable defense. *Cf. Thomas*, 768 S.W.2d at 336-37. Rather, counsel attempted to avoid presenting evidence referencing timeframes before the offense, pursuing witnesses who lacked personal knowledge of the statements they made, and undermining Noland's defense with harmful statements and admissions from his recorded jailhouse calls. On this record, Noland failed to: (1) overcome the strong presumption that his counsel's decision not to pursue or present the eight categories of evidence summarized above fell within the wide range of reasonable professional assistance and (2) show that his counsel's performance prejudiced his defense and deprived him of a fair trial given a reasonable probability of a different result if counsel had made other decisions about the usefulness and risks of those categories of evidence. *See Strickland*, 466 U.S. at 688, 694; *Perez*, 310 S.W.3d at 893.

Noland's last and related contention is that because his counsel was ineffective, the district court erred by denying the motion for new trial raising that complaint. However, we have concluded that Noland failed to meet his burden of showing that his counsel was ineffective under the *Strickland* standard. *See Strickland*, 466 U.S. at 688, 694; *Perez*, 310 S.W.3d at 893. Evidence at the new-trial hearing, viewed in the light most favorable to the district court's ruling, supports the denial of Noland's motion for new trial and that ruling is not outside the zone of reasonable disagreement. *See Burch*, 541 S.W.3d at 820; *Charles*, 146 S.W.3d at 208. Accordingly, we overrule Noland's appellate issues.

## CONCLUSION

We affirm the district court's judgment of conviction.

_____

Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Triana and Smith

Affirmed

Filed:   November 24, 2020

Do Not Publish